UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

_____
                                                     :
JOYAL PRODUCTS, INC.,                    :
                                                     :
              Plaintiff,                        :        Civil Action No. 04-5172 (JAP)
                                                     :
       v.                                       :              **OPINION**
                                                     :
JOHNSON ELECTRIC NORTH            :
AMERICA, INC. *et al.*,                    :
                                                     :
              Defendants.                   :
                                                     :
_____ :

PISANO, District Judge.

        Plaintiff, Joyal Products, Inc. ("Joyal" or "Plaintiff") filed this patent infringement

action against Johnson Electric North America Inc., Johnson Electric Consulting, Inc., and

Johnson Electric Manufacturory, Ltd. ("Johnson" or "Defendants") alleging that Johnson

infringed on Joyal's patent, United States Patent No. 5,111,015 (the "'015 patent"), titled

"Apparatus and Method for Fusing Wire."  This patent relates to a particular method for

making electrical connections in the production of a class of machines known as

dynamoelectric machines, which includes electric motors and generators.  Joyal alleged that

Johnson infringed on the '015 patent by importing and selling in the United States armatures

that were manufactured using the patented process.

        A few weeks before trial, which took place in October 2008, Johnson consented to the

entry of judgment of willful infringement of the '015 patent.  Shortly thereafter, the Court

granted summary judgment in favor of Plaintiff on Johnson's invalidity defenses and

counterclaim.  As a result, the only matter remaining for trial was the issue of damages.  After

a four-day trial in October 2008, a jury awarded damages in the amount of $4,598,184 to

Plaintiff.

Presently before the Court are several post trial motions.  Johnson has moved for

judgment as a matter of law or, in the alternative, a new trial.  Joyal has moved for (1) an

award of enhanced damages pursuant to 35 U.S.C. § 284, (2) attorneys fees pursuant to 35

U.S.C. § 285; (3) pre-judgment interest; (4) a permanent injunction to 35 U.S.C. § 283; (5) an

order setting an ongoing royalty rate; (6) an accounting; and (7) an award of its expert witness

fees.  For the reasons below, Johnson's motion is denied, and Joyal's motions are granted with

the exception of its motion for expert witness fees, which is denied.

**I.  Defendants' Motion**

*1.  Johnson's Motion for Judgment as a Matter of Law*

Johnson moves under Federal Rule of Civil Procedure 50 for judgment as a matter of

law on the issue of patent invalidity, arguing that claims 1-6, 8 and 16 of the '015 patent are

invalid as anticipated under 25 U.S.C. § 102 and are invalid as obvious under 35 U.S.C. §

103.  In support of its motion, Johnson first asserts that it is entitled to judgment as a matter of

law "for the same reasons set forth in its Motion and Cross-Motion for summary judgment."

Johnson further asserts that, in any event, it should not have been precluded from presenting

2

its invalidity case to the jury even though it did not have an expert on this issue.[1]   In response,

Joyal argues that Johnson's motion is procedurally baseless and is nothing more than an

improper attempt to seek reconsideration of the Court's summary judgment rulings on patent

validity.

Under Rule 50, a District Court may grant judgment as a matter of law if a "party has

been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable

jury to find for that party on that issue." Fed. R. Civ. P. 50(a)(1).  If the court denies a motion

for judgment as a matter of law during trial, the motion may be renewed within ten days of

entry of judgment in the case.  Fed. R. Civ. P. 50(b).

At trial, in the context of a Rule 50 motion, Johnson raised an issue regarding "the

summary judgment of patent invalidity," arguing that the issue of validity should have been

submitted to the jury.  Trial Transcript at 675:7-8, attached as Exhibit B to the Declaration of

Michael Pospis ("Pospis Decl.").  However, the issue of validity was not the subject of

evidence at trial, the parties were not fully heard on the issue of validity and the jury's verdict

did not address the issue.  The Court denied the motion and, recognizing the inapplicability of

Rule 50, stated that "[t]here was a summary judgment entered on the defense of invalidity.  To

the extent there is an application to reconsider that, it's denied."  Trial Transcript at 675:19-

21.  Johnson's current motion – namely, its renewed Rule 50 motion – is similarly

procedurally inappropriate, and appears to be little more than an attempt once again to argue

the issues raised (and ruled upon) in the motions for summary judgment.  Johnson's Rule 50

_____

[1]As noted earlier, the Court granted summary judgment in favor of Joyal on this issue prior to
trial.

3

motion, therefore, denied.  Further, to the extent that Johnson's motion can be considered yet another request for reconsideration of this Court's summary judgment rulings, that request is denied as well.

### 2. Johnson's Motion for a New Trial

Johnson alternatively argues that a new trial on damages is warranted because certain evidentiary rulings by the Court were allegedly erroneous and because an allegedly defective verdict sheet was submitted to the jury.  Rule 59 of the Federal Rules of Civil Procedure provides, in relevant part: "The court may, on motion, grant a new trial on all or some of the issues – and to any party – after a jury trial ... for any reason for which a new trial has heretofore been granted in an action at law in federal court ..." Fed. R. Civ. P. 59(a)(1)(A). Rule 59(a) does not specify the grounds on which a court may grant a new trial, but rather leaves the decision to the discretion of the district court.  *See Blancha v. Raymark Indus.*, 972 F.2d 507, 512 (3d Cir.1992) ("The decision to grant or deny a new trial is confided almost entirely to the discretion of the district court.") (citing *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36, 101 S. Ct. 188, 66 L. Ed.2d 193 (1980)).  Generally speaking, courts have granted new trials in cases where (1) there have been prejudicial errors of law; or (2) the verdict is against the weight of the evidence.  *Maylie v. Nat'l R.R. Passenger Corp.*, 791 F. Supp. 477, 480 (E.D. Pa.1992).  Granting a new trial requires meeting a "high threshold," *Grazier v. City of Philadelphia*, 328 F.3d 120, 128 (3d Cir. 2003), and "[a]bsent a showing of substantial injustice or prejudicial error, a new trial is not warranted."  *Montgomery Cty. v. MicroVote Corp.*, 152 F. Supp. 2d 784, 795 (E.D. Pa. 2001).

Johnson first alleges that there were various errors of law with respect to certain rulings by the Court.  When addressing this type of motion, a court "must determine: (1) whether an error was in fact made; and (2) whether the error was so prejudicial that a refusal to grant a new trial would be inconsistent with substantial justice." *Bhaya v. Westinghouse Elec. Corp.*, 709 F. Supp. 600, 601 (E.D. Pa.1989).  However, Defendant here makes little attempt to show how the alleged rulings were erroneous or to explain why the alleged errors were prejudicial.  Rather, Johnson literally repeats the exact same arguments it raised the first time the Court ruled on the various issues.  In fact, Plaintiff's entire argument in its moving brief consists of three sentences, the one of which merely incorporates by reference (1) its Motion in Limine to Exclude the Expert Testimony of Carl Degan; (2) its objections at trial to a certain evidentiary rulings; (3) its appeal of a decision by the Magistrate Judge; (4) and its objections in the Pre-trial Order and its Supplemental Objections.  The other two sentences of Johnson's argument baldly allege that a motion for a new trial is warranted because "substantial errors occurred in the admission or rejection of evidence."  The moving brief contains no further argument with respect to the evidentiary rulings and, as noted above, Johnson has not shown how it was prejudiced by any alleged error.  As such, Johnson's argument fails.

Next, Johnson argues it is entitled to a new trial because the Court asked the jury in the verdict form to determine the reasonable royalty rate for past infringing sales as a percentage of sales revenue, rather than in cents per unit of infringing product.  However, Johnson's own expert testified that a royalty for past damages could be expressed in either of these two terms.

5

Trial Tr. at 508.  The expert also explained how converting a royalty expressed in cents per unit into a percentage was a matter of simple arithmetic.  Trial Tr. at 508-11.  Additionally, Johnson has made no attempt to explain the prejudice that could have resulted from the verdict form, and the Court finds none.  Consequently, Johnson's motion for a new trial shall be denied.

## II.  Plaintiff's Motions

### *1.  Enhanced Damages*

Plaintiff seeks enhanced treble damages for Johnson's willful infringement of the '015 patent.  Pursuant to 35 U.S.C. § 284, a district court has the discretion in patent infringement cases to "increase the damages up to three times the amount found or assessed" by the jury.  Enhanced damages are punitive in nature and are based upon the conduct and culpability of the infringer.  *Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1570 (Fed. Cir. 1996).  As such, the Federal Circuit has held that an award of enhanced damages requires a showing of willful infringement, a threshold showing clearly satisfied in this case by Johnson's own stipulation.  *See In re Seagate Technology, LLC, 497 F.3d 1360, 1368* (Fed. Cir. 2007) ("[W]e have held that an award of enhanced damages requires a showing of willful infringement.").  Where "an infringer is guilty of conduct upon which enhanced damages may be based, the court next determines, exercising its sound discretion, whether, and to what extent, to increase the damages award given the totality of the circumstances."  *Jurgens,* 80 F.3d at 1570.

In considering enhanced damages, "the paramount determination ... is the egregiousness of the defendant's conduct, based on all the facts and circumstances."  *Electro*

*Scientific Industries, Inc. v. General Scanning Inc.*, 247 F.3d 1341, 1353 (Fed. Cir. 2001) (citing *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826 (Fed. Cir.1992)).  The Federal Circuit has identified several factors – referred to as the *Read* factors – for courts to consider in making the determination regarding enhanced damages:

> (1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; (3) the infringer's behavior as a party to the litigation; (4) defendant's size and financial condition; (5) closeness of the case; (6) duration of defendant's misconduct; (7) remedial action by the defendant; (8) defendants motivation for harm; and (9) whether defendant attempted to conceal its misconduct.

*Liquid Dynamics Corp. v. Vaughan Co., Inc.*, 449 F.3d 1209, 1225 (Fed. Cir. 2006) (internal quotations and alterations omitted) (quoting *Read Corp.*, 970 F.2d at 826-27).  Plaintiff argues that each of these factors weigh heavily in favor of trebling damages.  Johnson, on the other hand, while arguing that three of the *Read* factors militate against enhanced damages, does not appear to dispute Plaintiff's position as to the remaining six factors.  The Court will address each of the *Read* factors in turn.

*i.  Deliberate Copying*

Plaintiff points out that there is no dispute that Johnson used machines made by Joyal to copy Joyal's patented fusing method without a license, and that it also made copies of Joyal's machines so it could replicate Joyal's patented method.  Johnson admits this both in its answers to Joyal's interrogatories (*see* Exhibit 1 to the Declaration of Stephen Buckingham ("Buckingham Decl.") at 5) and by its silence in response to Plaintiff's arguments on this point.  The Court finds that this factor weighs in favor of enhanced damages.

*ii.  Lack of Good Faith Belief*

Plaintiff argues that the second *Read* factor is "conclusively established" against Defendant by Defendant's own admissions.  Pl. Brief at 8.  Plaintiff points to the following as evidence establishing this factor: (1) Johnson consented to entry of an Order of Judgment of Willful Infringement, which notes that Defendants "admitted that they have no good faith basis to dispute that each of them has at all material times infringed" on claims 1-6, 8 and 16 of the '015 patent; (2) in 1995, Johnson signed a temporary samples license with Joyal in which Johnson admitted that "[w]ithout a license from Joyal, Johnson would infringe the ['015 patent] if they import into the United States the sample and prototype electric motor armatures" made using Joyal's tang top fusing machine, Buckingham Decl. at Ex. 3; (3) despite this knowledge of Joyal's patent and potential infringement, prior to the lawsuit Johnson never obtained any opinion of legal counsel regarding the invalidity or non-infringement of the '015 patent; *see id.* at Ex. 1, Interrogatory No. 3; (4) prior to this lawsuit, Johnson never conducted any investigation of the validity or potential infringement of the '015 patent, *see id.*, Interrogatory No. 4.  Johnson does not respond to Plaintiff's argument regarding this factor nor does it dispute the factual assertions above.  Simply put, Johnson does not dispute the allegations that Johnson never investigated or formed a good faith belief that the '015 patent was invalid or not infringed.  The Court, therefore, finds that this factor weighs in favor of enhanced damages.

*iii.  Litigation Conduct*

The third *Read* factor requires to the Court to look at the infringer's behavior through

the course of the litigation.  Joyal argues that Johnson's conduct throughout this litigation has been "uniformly egregious," and characterizes the conduct as "that of a huge corporation trying intentionally to drive up unnecessarily the litigation costs of a small plaintiff corporation."  Plaintiff points to several instances in support of its assertion:

(1) Joyal sought to amend its complaint in May 2005.  Defendant opposed what appeared to be a routine motion to amend with arguments that Magistrate Judge Arleo characterized as "frivolous."  Buckingham Decl., Ex. 4 at 6-7.  Defendant's counsel even admitted to Judge Arleo at oral argument, "in all candor, Your Honor . . . I didn't expect you not to allow the amendment, in all honesty."  *Id.* at 6.

(2) In July 2005, Joyal was forced to seek the Court's intervention in order to obtain discovery as a result of an apparent lack of diligence on the part of Johnson in responding to Joyal's discovery requests.  *See id.* at Ex. 5.  An order compelling Johnson to produce the requested documents was entered.  *Id.* at Ex. 6.

(3) In September 2005, in response to Plaintiff's amended complaint, Johnson filed two motions seeking dismissal of the complaint for lack of jurisdiction, improper venue, and insufficient service of process.  The motions utterly lacked merit, and were denied by way of an Order in November 2005.

(4) In December 2005, Johnson filed a Rule 11 motion accusing Joyal of impleading Johnson Electric Industrial Manufactory, Ltd. ("JEI") without basis.  The motion was denied by the Court.  The basis for the motion was Joyal's argument that JEI did not import infringing products into the United States.  Plaintiff argues that this motion was frivolous

9

because it ignored the fact that JEI's captive subsidiary, Johnson Electric North America ("JENA"),  imported the infringing products as an exclusive agent for JEI.  Moreover, Johnson later stipulated in November of 2006 that JENA acted as an agent under the direction and control of JEI when it imported and sold the infringing products, and further stipulated in 2008 that JEI committed willful infringement.

(5) Joyal argues that Defendant took positions with respect to claim construction that were "baseless."  Pl. Brf. at 14.  In particular, Plaintiff asserts that Johnson's primary argument with respect to claim construction –  that the term "fusing" involved melting – had no basis in the patent or prosecution history and was contrary to the understanding of the term by someone skilled in the art of fusing.  Indeed, in construing the term, the Court so found.

(6) Subsequent to the Court issuing its *Markman* opinion construing the patent claims, Joyal asked Johnson to supplement or correct its interrogatory answer with respect to the interrogatory that asked why Johnson believed it did not infringe on Joyal's patent.  Johnson's then-existing interrogatory answer had been premised on a claim construction that was rejected by the Court.  Johnson refused Joyal's request to supplement.  When Joyal sought relief from the Court to compel Johnson to reveal if any basis remained for its allegations of non-infringement, the Magistrate Judge heard the parties on the issue.  Johnson advised that it was not putting on an affirmative case of non-infringement, but instead argued that Joyal's allegations were legally insufficient to establish infringement.  Buckingham Decl., Ex. 11. Notwithstanding this representation, Johnson later stipulated to willful infringement.

(7) Plaintiff argues that Johnson's identification of John Thomas, a law professor, as

an expert to opine on the validity of Joyal's patent was "patently inappropriate" and "frivolous."  Pl. Brf. at 16.  Joyal moved to preclude Mr. Thomas's testimony from being offered at trial, and that motion was granted by the Court.

(8) Johnson filed a motion seeking to preclude Joyal's damages expert, Carl Degen, from testifying at trial, a motion which Plaintiff characterizes as "baseless."  Plaintiff argues that the alleged "frivolous nature" of the motion is exemplified by Johnson's argument in that motion that Mr. Degen failed to account for non-infringing substitutes, only to have Johnson later admit on the eve of trial that no non-infringing substitutes existed.  *Id.* at Ex. 13.  The Court denied Johnson's motion to preclude.  Although the Court also denied Joyal's request for counsel fees pursuant to 28 U.S.C. § 1927, the denial was without prejudice to Joyal raising the issue again in a post trial motion.

(9) Joyal asserts that the motion filed by Johnson in May 2008 seeking summary judgment of invalidity was "frivolous."  Plaintiff argues that the motion consisted of "nothing more than arguments of counsel providing unqualified and unsworn opinions as to the meaning of complex technical documents."  Pl. Brf. at 18.  Indeed, the Court denied the motion without requiring Joyal to respond, finding that the motion was "replete with arguments of material facts."  Order dated June 17, 2008. The motion was denied "without prejudice to its being renewed by the Defendants at trial as a motion pursuant to Fed. R. Civ. P. 50."

(10) Johnson identified its expert on the issue of validity as Kurt Hofman.  After deposing Mr. Hofman, Joyal learned that Mr. Hofman did not consider himself to be an expert

in the relevant field, and Joyal therefore filed a motion to preclude him from testifying at trial. After Joyal incurred the expense of deposing Mr. Hofman and of filing the motion to preclude, Johnson did not oppose the motion and voluntarily withdrew Mr. Hofman as a witness.

(11) Because the withdrawal of Mr. Hofman left Johnson without an expert to testify at trial with respect to Johnson's invalidity defenses, Joyal moved for summary judgment seeking dismissal of Johnson's invalidity defenses and counterclaim. In response, Johnson cross-moved by renewing its previous summary judgment motion that had been earlier denied by the Court. Joyal's motion was granted and Johnson's summary judgment motion was denied.

(12) Plaintiff argues that Johnson's request to the Court to enter judgment against it for willful infringement demonstrates that Johnson never had any legitimate defense to infringement. Joyal points out that Johnson contested and litigated the issue of infringement for four years, only to abandon all defense of the issue on the eve of trial by stipulating to the entry of judgment of willful infringement.

(13) Joyal points to certain conduct of Johnson's counsel at trial. Specifically, while cross-examining Joyal's damages expert, Johnson's counsel repeatedly asked questions of a technical nature after being warned by the Court that the witness was not presented as a technical expert. Also, Joyal notes that the Court admonished Johnson's counsel during the direct examination of Johnson's own expert to "stop distorting the case, because you've done it more than once in the questions you put to this witness." Trial Tr. at 462.

In its response to Joyal's arguments, the Court first notes that Johnson does not appear to dispute the factual assertions by Joyal.  Indeed, each of Joyal's factual allegations regarding Johnson's litigation conduct is clearly established by the record in this case.  Rather, Johnson argues that its litigation behavior simply does not warrant an award of treble damages, pointing to certain district court decisions in which "the defendant engaged in litigation tactics similar to those Joyal alleges, but where the court found that *Read* factor three, litigation abuse, was either neutral or weighed against enhancement."  Def. Brf. at 5-6 (citing *TruePosition Inc. v. Andrew Corp.*, 568 F. Supp. 2d 500 (D. Del. 2008); *IMX v. Lendingtree, LLC*, 469 F. Supp. 2d 203 (D. Del. 2007); *Collegenet, Inc. v. Apply Yourself, Inc.*, 2004 U.S. Dist. Lexis 18887 (D. Or. Jan. 20, 2004).

The Court is not persuaded by the cases Johnson cites.  While those cases do involve some level of misconduct, the Court, which has dealt closely with this litigation and its lawyers for over four years, finds the present case distinguishable.  This case has involved, in particular, the consistent and ongoing use of litigation tactics by Johnson that appear to have been employed for the primary purpose of unnecessarily increasing the burden of this litigation on Joyal – *e.g.*,  filing motions of dubious merit; taking positions that caused Joyal to expend resources and later withdrawing those positions.  While perhaps in other situations courts have found that a few isolated incidents of questionable conduct may not warrant an enhancement of damages or may be excused as "zealous advocacy, genuine debate, and honest disagreement," *Collegenet*, 2004 U.S. Dist. Lexis at *38, the Court finds that Defendants' conduct in this case dictates otherwise.

Johnson also singles out its stipulation to willful infringement as a factor that should weigh against enhanced damages.  Citing to *TA Instruments v. Perkin-Elmer, Inc.*, 277 F. Supp. 2d 367 (D. Del. 2003), Johnson argues that stipulating to willful infringement, even at the eleventh hour, is actually a mitigating factor with respect to enhanced damages.  In *TA Instruments*, the court enhanced damages by a factor of two rather than three because it found that "in the end, [defendant] stipulated to willful infringement rather than force additional wasted time and resources by requiring [plaintiff] to provide willfulness."  277 F. Supp. 2d at 378.  However, the Court finds *TA Instruments* to be different from the instant case in an important respect.  In *TA Instruments*, the court found that "neither party ... exemplified good litigation conduct" and, further, while the defendant's conduct was found to be "more reprehensible," it was "only so by a matter of degree."  This is hardly the situation in the instant case, and the Court does not find Johnson's admission of willful infringement to be a mitigating factor.

Lastly, Johnson argues that the mere fact that "Joyal was successful in obtaining certain rulings in the course of the action does not establish that Johnson's positions were frivolous and abusive."  Def. Brf. at 6.  However, neither the Plaintiff's arguments nor the Court's review of the matter has taken such a simplistic view of the issue.  Looking at the course of this litigation in its entirety, considering all of the facts and circumstances, and examining the merits of the various positions taken by the parties and the motions filed, the only conclusion this Court can reach is that Johnson conducted itself throughout this action in a manner designed to unnecessarily maximize the overall burden and the litigation cost to its

adversary.  Thus, the Court finds that Johnson's litigation behavior weighs in favor of enhanced damages.

### iv.  Size and Financial Condition of Johnson

Johnson is a large,  publicly traded corporation that does business worldwide.  Its most recent publicly-reported annual sales were over $2.2 billion.  Johnson's damages expert testified at trial that Johnson's profit margin is in excess of 20%.  Trial Tr. 591.  Johnson's financial condition suggests that an award of enhanced damages would not impair its financial well-being.

### v.  Closeness of the Case

Plaintiff argues that this was not a close case in that Johnson stipulated to willful infringement and did not mount a serious challenge to the validity of the '015 patent.  Johnson has not disputed this point.  Indeed, this was not a close case.  The Court finds that this factor weighs in favor of enhanced damages.

### vi.  Duration of Misconduct

Johnson does not dispute Plaintiff's assertion that Johnson has been, since 2000, continuously infringing on Joyal's patent with knowledge of that patent.  This factor, therefore, weighs in favor of enhanced damages.

### vii.  Remedial Action

Johnson also does not dispute Plaintiff's assertion that it has never taken any action that could be reasonably viewed as "efforts to mitigate or minimize infringement in any way." To the contrary, Plaintiff points out that as demand for the infringing products grew, Johnson

compounded its infringing activities by copying Joyal's machines and increasing production. Again, Johnson does not dispute this point.  The Court finds that this factor weighs in favor of enhanced damages.

*viii.  Motivation to Harm*

In asserting that this eighth *Read* factor is met, Plaintiff points to Johnson's litigation conduct and argues that Johnson acted with a desire to inflict financial harm upon Joyal in terms of excessive litigation costs.  Joyal argues that Johnson intended to make Joyal, a small company, abandon this lawsuit "after being driven into poverty."  Pl.  Reply at 5.  Johnson responds that the appropriate analysis for this factor involves looking at an infringer's market conduct, not its litigation conduct, citing *TruePosition Inc. v. Andrew Corp.*, 568 F. Supp. 2d. 500, 529 (D. Del. 2008), *Church & Dwight Co. v. Abbott Labs.*, 2008 U.S. Dist. LEXIS 49588 (D.N.J. Jun. 23, 2003) and other cases in which the Court referred to the market conduct or status (*e.g.*, competitors, customer-supplier) with respect to this factor.  The Court agrees with Defendant that the more appropriate analysis for this eighth *Read* factor looks to marketplace and not the litigation conduct, which itself is covered by the third *Read* factor.  The Court also recognizes that it is likely that this factor would have more significance in situations where the parties have a competitive relationship, as opposed to a customer-supplier relationship as is the case here, because one competitor could potentially benefit from harm done to another.  In the instant matter, whether any marketplace harm came to Joyal appears to have been inconsequential to Johnson.  As such, the Court finds this factor is neutral in this case with regard to the analysis relating to enhanced damages.

*ix. Concealment of Misconduct*

Joyal asserts that both before and after this lawsuit was filed, Johnson affirmatively concealed its infringing conduct from Joyal.  Joyal notes that in late 2001, after Johnson began infringing on the '015 patent, there was an increased demand for the infringing products and Johnson needed to increase production capacity.  Johnson acquired one of Joyal's customers who owned a Joyal Tang Top fusing machine.  Trial Tr. at 166.  However, Johnson needed Joyal to rebuild the machine to be compatible with the Chinese power system, Trial Tr. at 167, and Joyal would not do so unless Johnson promised it would not import armatures made with the machine into the United States unless it first obtained a license.  Buckingham Decl. Ex. 16, 17.  Although Johnson had already been infringing on the '015 patent, Johnson concealed its ongoing infringement and gave Joyal the assurances it sought in an effort to induce Joyal to rebuild the machine.

Plaintiff also notes in further support of its argument that after this litigation commenced, Johnson failed to preserve records for the time period between 1999 and 2000, when Johnson began its infringement.

Johnson does not dispute any of the facts asserted by Plaintiff.  Rather, it responds that there can be no concealment as contemplated by this ninth *Read* factor if a product is "sold openly," as it alleges was done in this case.  Johnson cites *Church & Dwight, Co.*, 2008 U.S. Dist. Lexis 49588, at *5, *Floe Int'l Inc. v. Newmans Manufacturing*, U.S. Dist. Lexis 59872 (D. Minn. Aug. 23, 2006), and *Nexmed Holdings, Inc. v. Block Investment, Inc.*, U.S. Dist. Lexis 45900 (D. Utah Jul. 6, 2006).  However, unlike the present case, the infringing products in each of these cases were consumer products advertised and sold openly in retail stores.  In

contrast, as Plaintiff points out, the infringing product in this case was a component of a motor that was "hidden inside of the motor, which was hidden inside of a pump, which was hidden inside of a gas tank, which was hidden inside of an automobile."  Pl. Reply at 6.  Thus, the Court finds that Johnson's argument that it cannot be deemed to have concealed its infringement because the infringing product was "openly sold" is utterly without merit.  The Court finds that this ninth Read factor weighs in favor of enhanced damages.

*x. Conclusion as to Enhanced Damages*

Considering the totality of the circumstances, the Court finds that a significant enhancement is warranted in this case.  Indeed, there was an admission of willful infringement, no mitigating circumstances, and eight of the nine *Read* factors weigh in favor of enhanced damages.  Therefore, the Court in its discretion concludes that damages awarded by the jury in the amount of $4,598,184 shall be trebled to $13,794,552.

**2.  Attorneys Fees**

Plaintiff also seeks attorney fees under 35 U.S.C. § 285, which provides that courts in "exceptional cases" may award attorney fees to the prevailing party.  Exceptional cases include: "inequitable conduct before the PTO; litigation misconduct; vexatious, unjustified, and otherwise bad faith litigation; a frivolous suit or willful infringement."  *Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1034 (Fed. Cir.2002) (citation omitted).  Johnson does not dispute that this is an exceptional case, and given Johnson's willful infringement and its conduct in this litigation, and considering the totality of the circumstances in this case, the Court finds that this is an exceptional case warranting an award of attorney fees.

Johnson does assert, however, that the Court should eliminate or significantly reduce the fees requested by Plaintiff.  Johnson argues that the fees are not reasonable, that a number of the billing entries submitted by Plaintiff are vague and that Plaintiff has not made any effort to eliminate fees for non-recoverable overhead.  The Court has reviewed the Joyal's submissions in support of its fee request and finds Johnson's arguments to be without merit. Plaintiff has adequately supported its request for fees, and the Court finds the fees to be reasonable.  Accordingly, the Court awards attorney fees and costs to Plaintiff in the amount of $1,589,956.07.

### 3.  Prejudgment Interest

Joyal has moved for an award of prejudgment interest on the jury's damages award in the amount of $818,018 and prejudgment interest on its attorneys fees and expenses in the amount of $103,887.  These amounts were calculated by Joyal using the prime rate, compounded annually.  *See* Declaration of Carl Degen.  In response, Johnson agues the (1) prejudgment interest should be calculated at the Treasury bill rate; (2) the court should award simple, not compound interest; and (3) prejudgment interest should not be awarded on Joyal's attorney fees.  The court finds Johnson's arguments unavailing.

Section 35 U.S.C. § 284 provides for the calculation of damages "together with interest ... as fixed by the court."  In patent infringement cases, "prejudgment interest should be awarded under § 284 absent some justification for withholding such an award."  *General Motors v. Devex Corp.*, 461 U.S. 648, 657, 103 S.Ct. 2058, 76 L.Ed.2d 211 (1983).  Further, a court may award prejudgment interest on an attorney fee award where there has been a showing of "bad faith or exceptional circumstances."  *Mathis v. Sears*, 857 F.2d 749, 761

19

(Fed. Cir. 1988).

"'The Federal Circuit has given district courts great discretion' when determining the applicable interest rate for an award of prejudgment interest." *IPPV Enterprises, LLC v. EchoStar Comm'n Corp.*, No. Civ. A. 99-577-KAJ, 2003 WL 723260, at *3 (D. Del. Feb. 27, 2003) (citation omitted).  "Courts have recognized that the prime rate best compensate[s] a patentee for lost revenues during the period of infringement because the prime rate represents the cost of borrowing money, which is 'a better measure of the harm suffered as a result of the loss of the use of money over time.' " *IMX, Inc. v. LendingTree, LLC*, 469 F. Supp. 2d 203, 227 (D. Del.2007) (citing *Mars, Inc. v. Conlux USA Corp.*, 818 F. Supp. 707, 720-21 (D. Del.1993), *aff'd*, 16 F.3d 421 (Fed. Cir.1993)).   Accordingly, the Court concludes that prejudgment interest is appropriate for both the jury's award of damages and the Court's attorney fee award.  Prejudgment interest shall be calculated using the prime rate, compounded annually.

### 4.  Permanent Injunction

Joyal seek an injunction to enjoin Johnson from continuing to infringe Joyal's patent. A district court "may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable."  35 U.S.C. § 283.   A plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief.  *eBay Inc. v. MercExchange, L.L.C.*, 126 S.Ct. 1837, 1840 (2006).  These factors are as follows:

> (1) that [plaintiff] has suffered an irreparable injury: (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and

defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Id.* at 1839 (citations omitted).  Following this traditional test, the Court finds that the entry of a permanent injunction against Johnson is appropriate.

First, the Court finds that Joyal will suffer irreparable harm if Johnson is permitted to continue its infringement.  Because Joyal has ceased its manufacturing operations,[2] the '015 patent is one of its few remaining assets, and Joyal would like to sell this asset.  *See* Declaration of Allan Warner ("[B]ecause Joyal is no longer an operating business . . . [Joyal] would like to sell the '015 patent to the highest bidder, which likely would be an active competitor in the carbon commutator armature business.")  Plaintiff asserts that allowing Johnson to continue to import and sell infringing products in the United States would irreparably harm Joyal's ability to sell this asset.  Indeed, the most likely purchaser of the patent would be a manufacturer such as Johnson and, as Joyal points out, absent the right to exclude competitors from practicing the method covered by the patent, the patent's value would be diminished in a manner that would be difficult to quantify.  Indeed, the "principal value of a patent is its statutory right to exclude."  *Polymer Technologies, Inc. v. Bridwell*, 103 F.3d 970, 976 (Fed. Cir. 1996) (quoting *Hybritech Inc. v. Abbot Labs.*, 849 F.2d 1146, 1156-57 (Fed. Cir. 1988).  "The statutory right to exclude represents a tangential benefit associated with patent rights that cannot be quantified in monetary damages."  *Martek Biosciences Corp. v. Nutrinova Inc.*, 520 F. Supp. 2d 537, 558-59 (D. Del. 2007).  Furthermore, competitors of Johnson (and even Johnson itself) would have little incentive to purchase a patent that does

---

[2]According to Plaintiff, Joyal closed down its manufacturing business three years after Johnson began its infringement and within one year of the discovery of Johnson's infringement.

21

not give them exclusivity.

Second, the Court finds that monetary relief such as on-going royalties would not be an adequate remedy in this case for the same reasons.  Additionally, because Joyal is no longer an on-going business concern, it is impractical to impose what is in effect a compulsory license upon the parties.  This case is unlike several others cited by Johnson in which injunctive relief was denied, as those cases involved companies with an ongoing business who widely licensed their patents, *see*, *e.g.*, *MercExchange, LLC v. eBay, Inc.*, 500 F. Supp. 2d 556, 569 (E.D. Va. 2007) (noting that the plaintiff "continued to follow a consistent course of licensing its patents to market participants and is plainly willing to accept royalties and is plainly willing to accept royalties for future utilization of the patent").  To the extent that Joyal at one time undertook efforts to license the patent, this occurred several years ago at a time when the company was still in business.  It is, therefore, not relevant to the Court's analysis. Presently, there are no licenses for the '015 patent nor is Joyal seeking to actively license the patent.  Rather, as Joyal is no longer conducting business, it wishes to divest itself of this asset.  It justifiably expects to be able to sell that asset for maximum value.  Joyal's ability to obtain the maximum value from the sale – indeed, the very ability to sell the patent at all – will be materially impaired if Johnson is permitted to continue its to produce and sell infringing products in the United States.  Because the heart of this impairment centers of the right to exclude under the patent, this impairment simply cannot remedied by assessing an on-going royalty.

Third, the Court finds that balance of the hardships weigh against Johnson.  In fact, Johnson does not point to any particular harm that it will suffer if it is enjoined, but instead

baldly asserts that an injunction would "have a catastrophic effect on . . . Johnson" without any further specificity.[3]  Def. Brf. at 20.  However, as Joyal notes, the impact of an injunction of Johnson's business revenues would appear to be slight.  Johnson's expert on damages reported that the sale of the infringing products represented "0.00% to 0.57% of Defendants' total revenues from Fiscal Year 1996 to Fiscal Year 2007."  Supplemental Declaration of Stephen Buckingham, Ex. 26 at 36.  Weighed against the harm to Joyal discussed above, the balance of hardships weigh in favor of injunctive relief.

Last, the Court rejects Johnson's argument that the fourth factor, the public interest, weighs against a grant of injunctive relief.  Johnson supplies the infringing armatures to automotive companies in the United States.  According to Johnson, if it is forced to stop producing and selling the infringing armatures, there would be a "catastrophic" effect on its customers, their employees and the entire United States economy.  Def. Brf. at 20.  However, as explained below, Johnson's claims are simply not established by the evidence.

In support of its apocalyptic assertions, Johnson has provided to the Court the Declaration of John G. Glynn, Sales Manager of the Automotive Products Group of Johnson Electric North America ("JENA").  Mr. Glynn's declaration is comprised in its entirety of twelve sentences.  In his declaration, Mr. Glynn states that JENA sells monthly approximately 162,000 graphite armatures to automotive manufacturers in the United States, of which approximately 134,000 are used for the production of new automobiles.  Each car manufactured uses one such armature.  According to Mr. Glynn, JENA's automotive

---

[3]Johnson also points to alleged harms that will occur in the marketplace.  These issues are, however, more appropriately addressed in the public interest factor of this analysis.

customers keep no more than a one to two week supply of the armatures inventoried, therefore, if JENA stopped delivery of these motors, the entire "supply chain running from fuel pump manufactures, to fuel tank manufacturers, to vehicle manufacturers would have to shut down production."  Glynn Decl. ¶ 5(a).  Mr. Glynn states that it would take up to three years "before a substitute supplier could be qualified under the governmental standards applicable to domestic automotive manufacturing."  *Id.* at ¶ 5(b).  Mr. Glynn therefore concludes that the "economic effect upon the automotive industry, including the employees that work in that industry, would . . . be devastating should JENA be forced to stop supplying graphite armatures."  *Id.* at ¶ 6.

The Court finds a number of deficiencies in Mr. Glynn's submission.  For example, conspicuously absent from the declaration is an statement that JENA is the sole supplier of these armatures to its customers in the automotive industry.  Also, where the declaration references the time necessary to qualify a supplier under "governmental standards," there is no citation to any specific "governmental standard." referenced.  Nor does Mr. Glynn state that he has personal knowledge of the supply chain of Johnson's customers or personal knowledge of their operations.  Indeed, the Court finds the entire declaration to be self-serving and speculative.  Mr. Glynn simply does not provide adequate bases for his bald assertions.

Furthermore, Mr. Glynn's declaration is at odds with other evidence in this case.  For example, as Joyal points out, Johnson Electric's own expert testified at his deposition that automobile manufacturers typically keep a "short list" of competitors who are qualified to respond to submit quotations and proposals for replacement parts.  Bratic Dep. at 141.  Mr. Bratic further testified of his understanding that there are "a lot of other companies" in the

24

carbon armature business, and that "any one of them" could supply Johnson Electric's customers with parts, because "as competitive as this industry is, there's no exclusivity." Bratic Dep. at 146-47.

Consequently, the Court cannot conclude, as Johnson asks it to, that there is a likelihood that the United States automotive industry would come to a complete halt for up to three years if JENA could no longer continue to infringe the '015 patent and supply a single part used in manufacturing of a fuel pump.  As such, given the public's interest in the enforcement of patent rights and the lack of a countervailing public harm, the Court finds that this fourth factor weighs in favor of granting injunctive relief.

### 5.  Post-Judgment Royalty

Joyal has moved for an order setting a post-judgment royalty rate for ongoing sales of infringing armatures from October 27, 2008 up until such time that an injunction issues and, further, to be applied in the event that an injunction may be stayed.  Joyal seeks a post-judgment ongoing royalty rate of 26%, which, according to its expert, is Johnson's net operating profit rate for fiscal year 2006 (the most recent data available).  *See* Declaration of Carl Degen.  Johnson does not dispute the accuracy of Joyal's figure, but Johnson objects to an ongoing royalty rate in the amount of 26%, arguing that the Court "should maintain the on-going royalty rate at the jury-determined reasonable royalty rate of 8%."  Def. Brf. at 23. Because Johnson does not appear to object to the Court setting an ongoing royalty rate but rather objects only to the amount requested by Joyal, the Court will set a post-judgment ongoing royalty rate to be applied from the date of judgment through the date of the injunction, and which should be applied in the event that a stay of the injunction is entered at

any time in the future.

In determining an appropriate rate, the Court rejects Johnson's position that the royalty rate determined by the jury should govern post judgment.  Case law is clear that the calculus for determining a post judgment royalty is not the same as that for determining a reasonable royalty based upon pre-judgment infringement.  The Federal Circuit has noted that because the parties' bargaining positions change upon a judgment for the patentee, an on-going royalty rate ordered as a remedy during a stay of a permanent injunction pending appeal should not automatically be the same reasonable royalty rate applied by the jury in determining the damages for past infringement.  *See Amado v. Microsoft Corp.*, 517 F.3d 1353, 1361 (Fed. Cir. 2008) ("There is a fundamental difference ... between a reasonable royalty for pre-verdict infringement and damages for post-verdict infringement.") (citing *Paice LLC v. Toyota Motor Corp.,* 504 F.3d 1293, 1317 (Fed. Cir. 2007) ("[P]re-suit and post-judgment acts of infringement are distinct, and may warrant different royalty rates given the change in the parties' legal relationship and other factors.") (Rader, J., concurring).  Consequently, in situations where a district court finds that an injunction is warranted but the injunction is stayed pending appeal,

> the assessment of damages for infringements taking place after the injunction should take into account the change in the parties' bargaining positions, and the resulting change in economic circumstances, resulting from the determination of liability--for example, the infringer's likelihood of success on appeal, the infringer's ability to immediately comply with the injunction, the parties' reasonable expectations if the stay was entered by consent or stipulation, etc.--as well as the evidence and arguments found material to the granting of the injunction and the stay.

*Amado*, 517 F.3d at 1362.  Given the equities in this case, and considering the various factors

set forth in *Amado* that are applicable here, the Court finds that an ongoing royalty rate of 26% is appropriate.  In this case, Johnson admitted to willful infringement of the '015 patent and it never established a serious validity challenge.  Moreover, it is clear that Joyal has no desire to license the '015 patent, but seeks to sell it unencumbered by a compulsory license.  A royalty rate of 26% is equitable in this case in that it would not allow Johnson to profit from any further willful infringement, and, further, would adequately compensate Joyal for being unwillingly deprived of its right to exclusivity.

## 6.  Accounting

Joyal has moved for an accounting of Johnson's sales during (1) the period from April 1, 2007 through September 30, 2008, a period for which Johnson did not provide actual sales figures and for which Joyal's damages expert had to estimate Johnson's sales based on forecasts provided by Johnson in discovery; and (2) the period from September 30, 2008 through the date of any amended judgment, since Johnson does not dispute that it continues to willfully infringe the '015 patent and, Joyal argues, it is owed reasonable royalties for that time.

Citing *Tristrata Tech., Inc. v. ICN Pharms., Inc.*, No 01-150, 2004 WL 769357 (D. Del. April 7, 2004) (accounting not requested in either the complaint or the pretrial order), Johnson argues that Joyal waived its right to an accounting by not requesting on in the Pretrial Order.  However, unlike in *Tristrata*, Joyal did preserve its right to an accounting by demanding it in its Third Amended Complaint.  *See* Third Am. Compl. at 10.

Additionally, with respect to the April 1st through September 30th period, Joyal sought this information prior to trial.  However, Johnson's counsel resisted the request, and

noted in correspondence to Joyal's counsel that Joyal "could always move to adjust the award based upon the royalty provided at judgment."  Buckingham Decl. Ex. 20.  Joyal states that because of this assurance by Johnson's counsel that the updated sales information could be obtained if Joyal was successful at trial, Joyal did not move to compel production of this information prior to trial.  Given this communication between counsel, Johnson should not be now be heard to complain that Joyal has waived its right to the information.

For these reasons, Joyal's motion for an accounting shall be granted.  Johnson shall provide an accounting of actual sales of infringing products sold since April 1, 2007.

### 7.  Expert Witness Fees

Relying upon a recent Federal Circuit case, *Takeda Chemical Industries v. Mylan Labs.*, 549 F.3d 1381 (Fed. Cir. 2008), Joyal has moved for sanctions in the form of an award of its expert witness fees, which total $108,598.49.  In *Takeda*, the Federal Circuit affirmed the decision of a district court to impose such sanctions against defendants who engaged in "bad faith and vexatious litigation conduct."  549 F.3d at 1391.

"A district court may invoke its inherent power to impose sanctions in the form of reasonable expert fees in excess of what is provided by statute."  *Id.*  However, a district court should only resort to this inherent power in those cases in which there is "a finding of fraud or abuse of judicial process."  *Id.* (quoting *Amsted Indus. Inc. v. Buckeye Steel Castings Co.*, 23 F.3d 374, 379 (Fed. Cir. 1994).  *See also id.* at 1392 ("[A] district court may resort to its inherent power to impose sanctions only in those highly unusual cases in which the pertinent statutory remedies are plainly inadequate to address the misconduct at issue) (Bryson, J., concurring in part); *Amsted*, 23 F.3d at 379 ("The court should resort to its inherent power

28

only where the rules or statutes do not reach the acts which degrade the judicial system....

[C]ourts should only resort to further sanctions when misconduct remains unremedied by

those initial tools."); *Martin v. Brown*, 63 F.3d 1252, 1265 (3d Cir.1995) ( "inherent power

should be reserved for those cases in which the conduct of a party or an attorney is egregious

and no other basis for sanctions exists").

Johnson's conduct in this litigation was sufficiently egregious that it supported, along

with other relevant factors, an award of enhanced damages.  Nevertheless, the Court does not

find that this case is one of those "highly unusual" cases which warrants resort to the Court's

inherent power to impose sanctions.  Defendant's inappropriate conduct in this case is

adequately redressed by the award of treble damages under 35 U.S.C. § 284 and the award of

attorney fees under 35 U.S.C. § 285.  Plaintiff's motions for sanctions is, therefore, denied.

## III.  Conclusion

For the reasons above, Johnson's motion for judgment as a matter of law or, in the

alternative, for a new trial is denied.  Joyal's motions for an award of enhanced damages

pursuant to 35 U.S.C. § 284; for attorneys fees pursuant to 35 U.S.C. § 285; for pre-judgment

interest; for a permanent injunction to 35 U.S.C. § 283;  for an order setting an ongoing

royalty rate; and for an accounting are granted.  Joyal's motion for an award of its expert

witness fees is denied.  An appropriate Order accompanies this Opinion.


/s/ JOEL A. PISANO
United States District Judge


Dated: February 26, 2009

29